**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH EBIN and YERUCHUM JENKINS, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>KANGADIS FOOD INC., d/b/a THE GOURMET FACTORY<br><br>            Defendant. | Civil Action No. 13-CV-2311 (JSR) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

Dated: November 1, 2013

**BURSOR & FISHER, P.A.**

Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Neal J. Deckant (ND1984)
Yitzchak Kopel (YK5522)
888 Seventh Ave
New York, NY 10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       ndeckant@bursor.com
       ykopel@bursor.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  SUMMARY OF COMMON FACTS ............................................................................ 2

III.  THE LEGAL STANDARD FOR CLASS CERTIFICATION ........................................ 11

IV.  THE REQUIREMENTS OF RULE 23(a) ARE READILY MET ................................... 11

    A.  The Class Satisfies The Numerosity Requirement ................................................ 12

    B.  Commonality Is Satisfied ...................................................................................... 12

    C.  Plaintiffs' Claims Are Typical ............................................................................... 13

    D.  Plaintiffs Will Adequately Represent The Class And Subclasses ........................ 14

        1.  Plaintiffs' Interests Do Not Conflict With The Class Or Subclasses ..................................................................................... 14

        2.  Plaintiffs' Counsel Are Qualified ............................................................. 15

V.  THE PROPOSED CLASS SATISFIES RULE 23(b)(3) ............................................... 16

    A.  Common Questions Of Law Or Fact Predominate ............................................... 16

        1.  The Elements Of The New York And New Jersey Consumer  Protection Claims Can Be Established Through Common Proofs ............................................................................................ 16

        2.  The Elements Of The Warranty Claims Can Be Established Through Common Proofs .......................................................................... 19

        3.  The Elements Of Fraud And Negligent Misrepresentation Can Be Established Through Common Proofs ......................................... 20

    B.  Class Litigation Is Superior To Other Methods Of Adjudication ........................ 21

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................. 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013).............................................................. 16

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................... 14

*Blessing v. Sirius XM Radio Inc.*,
2011 WL 1194707 (S.D.N.Y. Mar. 29, 2011) ....................................... 23

*Bosland v. Warnock Dodge, Inc.*,
197 N.J. 543 (2009) ................................................................ 17

*Bregman Screen & Lumbar Co. v. Bechefsky*,
16 N.J. Super. 35 (App. Div. 1951) ................................................ 19

*Carnegie v. Household Intern., Inc.*,
376 F.3d 656 (7th Cir. 2004) ...................................................... 25

*Civic Ass'n of the Deaf v. Giuliani*,
915 F. Supp. 622 (S.D.N.Y. 1996).................................................. 12

*Consol. Rail Corp. v. Hyde Park*,
47 F.3d 473 (2d Cir. 1995)......................................................... 12

*Cortigiano v. Oceanview Manor Home for Adults*,
227 F.R.D. 194 (E.D.N.Y. 2005) .................................................... 11

*Elias v. Unger Food Products, Inc.*,
252 F.R.D. 233 (D.N.J. 2008)................................................... 17, 19

*Fogarazzao v. Lehman Bros., Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) .................................................... 13

*Gennari v. Weichert Cop. Realtors*,
148 N.J. 582 (1997) ................................................................ 17

*Gortat v. Capala Bros., Inc.*,
257 F.R.D. 353 (E.D.N.Y. 2009)................................................. 11, 23

*Grainger v. State Sec. Life Ins. Co.*,
    547 F.2d 303 (5th Cir. 1977) ............................................................... 21

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968).................................................................. 13

*Guido v. L'Oreal, USA, Inc.*,
    284 F.R.D. 468 (C.D. Cal. 2012) .......................................................... 18

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).................................................................... 23

*In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) .......................................................... 23

*In re Visa Check / MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001).............................................................. 11, 24

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) .......................................................... 23

*Lee v. Carter-Reed Co., L.L.C.*,
    203 N.J. 496 (2010) ............................................................................. 17

*Leider v. Ralfe*,
    387 F. Supp. 2d 283 (S.D.N.Y. 2005).................................................... 17

*Mariso A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997).................................................................. 11

*Montich v. Miele USA, Inc.*,
    849 F. Supp. 2d 439 (D.N.J. 2012) ....................................................... 20

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)........................................................... 16, 21

*Morrissey v. Nextel Partners, Inc.*
    72 A.D.3d 209 N.Y.S.2d 580 (2010) ..................................................... 18

*Noble v. 93 Univ. Place Corp.*,
    224 F.R.D. 330 (S.D.N.Y. 2004) .......................................................... 23

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985).............................................................................. 11

*Ries v. Arizona Beverages USA LLC,*
  287 F.R.D. 523 (N.D.Cal. 2012)............................................................................ 24

*Seijas v. Republic of Argentina*,
  606 F.3d 53 (2d Cir. 2010)..................................................................................... 22

*Stutman v. Chem. Bank*,
  95 N.Y.2d 24 (2000) ............................................................................................... 17

*Super Glue Corp. v. Avis Rent A Car Sys.*,
  132 A.D.2d 604 (1987) ........................................................................................... 17

*Taylor v. American Bankers Ins. Group.*,
  267 A.D.2d 178 (1999) ........................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)............................................................................................ 11

**Statutes**

N.J. Stat. Ann. § 12A:2-314........................................................................................ 20

N.J.S.A. §§ 56:8-1 .......................................................................................... 2, 13, 16, 17

New York's General Business Law § 349 ........................................................... passim

**Rules**

Fed. R. Civ. P. 23(a) ..................................................................................................... 11

Fed. R. Civ. P. 23(a)(2).................................................................................................. 12

Fed. R. Civ. P. 23(a)(3).................................................................................................. 13

Fed. R. Civ. P. 23(a)(4).................................................................................................. 14

Fed. R. Civ. P. 23(b)(3)........................................................................................ 2, 16, 22

**Regulations**

N.Y. Comp. Codes R. & Regs. tit. 1, § 269(a)(5)......................................................... 5

# I.     INTRODUCTION

From 2006 through March 1, 2013, defendant Kangadis Food Inc. d/b/a Gourmet Factory imported refined olive pomace oil from overseas refineries including ACOLSA, a Spanish oil refinery with the largest production volume of refined olive pomace oil in the world. The oil arrived in 20-foot long 6,000-gallon flexitanks which were trucked to the Gourmet Factory's facility in Hauppauge, New York, where the contents were pumped into holding tanks. From there the refined pomace oil was packed into tins labeled "Capatriti 100% Pure Olive Oil." Gourmet Factory sold those tins to distributors and retailers in New York, New Jersey, Connecticut, Massachusetts, and Pennsylvania, and it was stocked on supermarket shelves throughout the Northeast. Retail sales through March 1, 2013 were roughly $81.24 million. Declaration of Colin B. Weir ¶ 16.

Plaintiffs Yeruchum Jenkins and Joseph Ebin both purchased Capatriti believing the tin contained only olive oil. Instead they got something different. Pomace oil.

> Q:     Now, can you explain to me in your own words what this lawsuit's about?
>
> A:     I purchased a tin of olive oil expecting what the label said, that it was a hundred percent olive oil, when it fact it turned out to <u>not</u> be 100 percent olive oil.

Jenkins Dep. at 41:17-22 (underlining added), Marchese Decl. Ex. A.[1]

> Q:     Can you tell me in your own words what this case is about?
>
> A:     Sure. This case is about a breach of warranty and false advertising. The olive oil that I purchased said all over it that it's a hundred percent pure olive oil. And that was the primary reason I bought it, was because I wanted a hundred percent pure olive oil. I was dissatisfied with the product and later learned unsurprisingly that it was not in fact a

---

[1] For sake of brevity, all objections have been omitted from the deposition excerpts quoted in this brief and in the accompanying declarations. However, the full excerpted transcript pages with objections intact are submitted herewith as exhibits to the Declaration of Joseph I. Marchese.

> hundred percent pure olive oil, but rather olive pomace oil.
> I'm here representing a class of people that also bought this
> product that were wronged because of false advertising and
> breach of warranty.

Ebin Dep. at 47:25-48:10, Marchese Decl. Ex. B.  Plaintiffs assert claims for breach of express warranty, breach of the implied warranty of merchantability, negligent misrepresentation, fraud, and violation of New York's General Business Law § 349 and New Jersey's Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

This case is ideally suited for class treatment.  Since every tin was labeled "100% Pure Olive Oil," and every tin in fact contained pomace oil, the essential elements of every claim can be proven with common classwide evidence.  Plaintiffs therefore move pursuant to Fed. R. Civ. P. 23(b)(3) for certification of a class defined as "all persons in the United States who purchased Capatriti 100% Pure Olive Oil packed before March 1, 2013" (the "Class").  Ebin, who purchased Capatriti 100% Pure Olive Oil at a Key Food store in the Bronx, New York in August 2012, also moves to certify a subclass of Class members who purchased in New York (the "New York Subclass").  Ebin Dep. at 34:11-19, 36:6-7, Marchese Decl. Ex. B.  Jenkins, who purchased Capatriti 100% Pure Olive Oil in January 2013 at a Shop Rite in Nutley, New Jersey, seeks to represent a subclass of Class members who purchased in New Jersey (the "New Jersey Subclass").  Jenkins Dep. at 41:17-42:11, 83:11-12, Marchese Decl. Ex. A.

## II.    SUMMARY OF COMMON FACTS

The product that was packed into Capatriti 100% Pure Olive Oil tins from 2006 through March 1, 2013 was refined olive pomace oil.  *See, e.g.*, Dennis Kangadis Dep. at 117:23-25, Marchese Decl. Ex. C ("The Capatriti one hundred percent pure olive oil was olive pomace oil.").

> Q:     Between 2006 and 2013, did Kangadis use ACOLSA as a
>        supplier to supply olive pomace oil for its Capatriti one
>        hundred percent pure olive oil product?
>
> A:     We purchased the product from them.

*Id.* at 112:7-18.

> Q:     But prior to March 1, 2013, Capatriti one hundred percent
>        pure olive oil contained only olive pomace oil; right?
>
> A:     Correct.

*Id.* at 60:15-19. This is consistent with the company's admission in *North American Olive Oil Association (NAOOA) v. Kangadis Food Inc.* that "'at all relevant times prior to this action,' its '100% Pure Olive Oil' product 'contained only Olive-Pomace Oil.'" *NAOOA v. Kangadis Food Inc.*, 13 Civ. 868 (JSR), 4/25/13 Opinion And Order at 3 (hereafter, "4/25/13 Opinion"), Marchese Decl. Ex. D; *see also* 3/20/13 Themis Kangadis Aff. ¶ 31, Marchese Decl. Ex. E ("Capatriti … contains only Olive-Pomace Oil."). That admission was repeated again in briefing in this case, where Defendant stated: "Capatriti was never an 'olive oil mixture,' … as at all relevant times prior to this action, it contained only Olive-Pomace Oil." 5/3/13 Def.'s Mem. Of Law In Supp. Of Mot. To Dismiss at 8 [Dkt. No. 11].[2]

This court already described the significant differences between pomace oil and olive oil in the *NAOOA* case:

> "[T]he substance commonly known as 'olive oil' comes from
> olives that are harvested, quickly carried to a mill, washed,
> crushed, and spun to separate out extraneous solids and excess
> water. This process is entirely mechanical and involves no heat or
> chemicals. The product directly resulting from this process is
> generally known as 'virgin olive oil.' If virgin olive oil undergoes

---

[2] After March 1, 2013, the company changed the formulation and began filling the tins with real olive oil. See 3/20/13 Themis Kangadis Aff. ¶ 51, Marchese Decl. Ex. E. ("Kangadis no longer uses any Olive-Pomace Oil in Capatriti and, instead, is now filling its Capatriti tins with only 'Olive Oil' …. In fact, as of March 1, 2013, all of the Capatriti tins filled by Kangadis and distributed in the United States contain only 'Olive Oil.'").

> refining to remove impurities, then it is no longer called 'virgin,'
> but remains 'olive oil.' By contrast, Pomace, also known as olive-
> Pomace oil, is made from the residue materials left over after olive
> oil has been mechanically extracted from the flesh of the olives.
> The residual skins, pits, and pulp are sent to specialized facilities,
> where they are dried, heated, and treated with industrial solvents to
> produce Pomace.
>
> Kangadis does not dispute these significant differences in the
> production of olive oil and Pomace."

4/25/13 Opinion at 3 (citations omitted), Marchese Decl. Ex. D. These differences led the court

to conclude that Capatriti's label was "literally false":

> "NAOOA has adequately shown that it is literally false, and not
> simply potentially misleading, to advertise Pomace as '100% Pure
> Olive Oil.' While Pomace may in some sense be 'olive oil' in that
> it is an oil derived from olives, it is not remotely what the ordinary
> consumer understands 'olive oil' to be."

*Id.* at 17. Defendant contends that finding has no preclusive effect in this action. Nevertheless,

the evidence of the literal falsity of the Capatriti label is even more overwhelming here than it

was in the *NAOOA* case.

Seven categories of evidence confirm that pomace oil is not remotely what the ordinary

consumer understands olive oil to be.

First, olive oil has olive flavor. *See, e.g.*, Gourmet Factory Olive Oil Specifications at

Kangadis 007045, Marchese Decl. Ex. F ("Olive oil should have a fruity olive flavor."). But

pomace oil is tasteless and odorless:

> Q:     What is the flavor profile of Capatriti 100 percent pure
>        olive oil?
>
> A:     Pretty bland.
>
> Q:     Tasteless and odorless?
>
> A:     For the most part.

Themis Kangadis Dep. at 78:22-79:1, Marchese Decl. Ex. G.  In fact, Gourmet Factory's supplier, ACOLSA, represents that its refining process renders its pomace oil "completely free of odor and taste."  ACOLSA Website at 000429, Marchese Decl. Ex. H (describing ACOLSA's "process of refining olive pomace oil," including "deodorization," which "makes the oil completely free of odor and taste"); *see also* N.Y. Comp. Codes R. & Regs. tit. 1, § 269(a)(5) ("Refined olive-pomace oil … is odorless and flavorless").

<u>Second</u>, flavor is by far the most important attribute affecting consumers' decisions to purchase olive oil.  Defendant's expert, Dr. John L. Stanton, cites the University of California, Davis Olive Center survey (May 2013) showing that perceived flavor was the most important factor influencing decisions to purchase olive oil, with 80% of respondents rating flavor as "extremely important" or "very important":

> Q:     The question is, do you expect a product that's labeled 100
>        percent pure olive oil to have flavor?
>
> A:     … Yes.  Yes.  …
>
> Q:     Yeah.  So I mean, you would expect a product labeled 100
>        percent pure olive oil to have some flavor?
>
> A:     I would personally say yes.
>
> Q:     All right.  And would you expect it to have an odor?
>
> A:     Of course, I would expect it to have an odor.
>
> …
>
> Q:     And the UC Davis survey shows that 80 percent of
>        consumers share your expectations; isn't that correct?
>
> A:     They said they did, yes.
>
> Q:     In fact, they said 80 percent regarded flavor as being either
>        extremely important or very important, right?
>
> A:     I believe that's what they said, yeah.

Stanton Dep. at 56:2-58:5, Marchese Decl. Ex. I.  Gourmet Factory's former Director of Quality

Assurance and Food Safety, Maria Inetti, also agrees:

> Q:      So it should taste and smell like olives, right?
>
> A:      Yes.
>
> Q:      That's your understanding of olive oil?
>
> A:      Yes.
>
> …
>
> Q:      Is that what you expect when you buy olive oil?
>
> A:      Yes.

Inetti Dep. at 170:13-171:18, Marchese Decl. Ex. J.  This testimony strongly supports the court's

conclusion from the *NAOOA* case that pomace oil is not remotely what the ordinary consumer

understands olive oil to be.  Simply put, the ordinary consumer expects olive oil to have olive

flavor.  Pomace oil has no flavor.

Third, as a matter of economics, pomace oil is a different and inferior product from olive

oil.  An expert economist retained by Plaintiffs, Colin Weir, explains:

> "[E]very single data set that I get confirms and repeats the analysis
> that I've done, that pomace is a totally inferior product.  That it's
> outsold 50 to one by 100 percent pure oil, and that 100 percent
> pure olive oil sells at a price premium of at least 50 to a hundred
> percent over comparable brands and sizes of pomace."

Weir Dep. at 255:20-256:1, Marchese Decl. Ex. K.

Fourth, as a matter of chemistry, pomace oil is significantly different from olive oil.

According to Professor Rodney J. Mailer, Ph.D., an expert in oil chemistry, pomace oil contains

"high levels of wax, erythrodiol, and uvaol."  Mailer Decl. ¶ 53.  "Pomace oil is also higher in

undesirable chemicals such as trans fats."  *Id.* ¶ 55.  "Under any standard, pomace oil is not olive

oil, and in no case could it be called or understood to be olive oil.  The extraction process results

in a product which is significantly inferior due to the lack of antioxidants and flavor, and may

contain traces of PAHs [polycyclic aromatic hydrocarbons] or solvents such as hexane used to

extract the oil." *Id.* ¶ 54.

<u>Fifth</u>, every state, federal and industry labeling standard distinguishes between olive oil

and pomace, and requires the latter to be labeled as such.[3]  But throughout the class period the

Capatriti label always said "100% Pure Olive Oil" and it never said pomace oil:

> Q:    So, do you have any reason to believe that from 2006 to
>        March, 2013 that this product packaging changed, sitting
>        here today?
>
> A:    I believe it's pretty much the same.
>
> …
>
> Q:    That always stated that it was one hundred percent pure
>        olive oil, right?
>
> A:    I believe so.
>
> Q:    And so far as you know, prior to March 1, 2013, that
>        representation never changed; right?
>
> A:    It's the same.

---

[3] See 7 C.F.R. § 240.1535 (voluntary USDA standard providing that "[o]live-pomace oils shall
not be labeled as 'olive oil'"); 47 Fed. Reg. at 42,123 (FDA notice explaining that, under certain
unnamed labeling standards, "oil extracted from olive pomace and pits by chemical means and
refined to make it edible must be labeled either 'refined olive-residue oil' or 'refined extracted
olive-residue oil'"); N.Y. Agric. & Mkts. Law § 204-a(a), (b) (separately defining "olive oil" and
"olive pomace oil" and establishing "rules and regulations for the production and labeling of
olive oils," the violation of which renders the product "misbranded"); N.Y. Comp. Codes R. &
Regs. tit. 1, § 269(a)(1), (c) (establishing separate "standards of identity" for "olive oil" and
"olive pomace oil" as well as separate "[n]omenclature; label statement[s]" for same);
International Olive Council, IOC Trade Standard, COI/T.15/NC No. 3/Rev.6 § 2.2 (Nov. 2011)
(trade standard of U.N.-based intergovernmental body providing that "[o]live oil is the oil
obtained solely from the fruit of the olive tree ..., to the exclusion of oils obtained using solvents
or re-esterification processes"); Conn. Gen. Stat. § 21a-100-8 (requiring olive oil sold in
Connecticut to "meet the International Olive Council standards").

Dennis Kangadis Dep. at 76:24-78:14, Marchese Decl. Ex. C.

> Q:    How come you never labeled the pomace oil as pomace oil?
>
> A:    It's called marketing.
>
> Q:    What does that mean, "It's called marketing"?
>
> A:    We marketed the product as 100 percent pure olive oil, 'cause it was 100 percent pure olive oil.
>
> Q:    'Cause it would sell better if the label said that instead of saying pomace oil?
>
> A:    Not necessarily.  That's what the chains wanted.  The chains – you know, consumers, you know, from what we know being in the industry, they like to see the word "Pure."  As a matter of fact, consumers think that pure is better than extra virgin.

Themis Kangadis Dep. at 223:16-224:11, Marchese Decl. Ex. G.

Sixth, the evidence also overwhelmingly demonstrates that if Capatriti had been labeled as pomace, no one would have bought it.  Indeed, in the *NAOOA* case Kangadis admitted that if consumers were notified "about the presence of Olive-Pomace Oil in Capatriti, its sales of Capatriti certainly will plummet."  4/25/13 Opinion at 17, Marchese Decl. Ex. D, quoting 3/20/13 Kangadis Br. at 23, Marchese Decl. Ex. E.  Both class representatives testified that they would not have bought Capatriti if it had been labeled as pomace:

> Q:    Now, let me ask you this:  If instead of a hundred percent pure olive oil on the label, if it said a hundred percent pomace oil, would you have bought the product?
>
> A:    No.
>
> Q:    Why not?
>
> A:    'Cause I was looking to purchase olive oil, not something close to it or similar to it.  I was looking for something that tasted and smelled like [olive oil].

Jenkins Dep. at 210:23-211:12, Marchese Decl. Ex. A.

> Q:     Would you have purchased the tin of Capatriti 100 percent
>        pure olive oil if you knew that the tin actually contained
>        olive-pomace oil?
>
> A:     Definitely not.

Ebin Dep. at 229:22-230:1, Marchese Decl. Ex. B. The class representatives' testimony on this

point is buttressed by Gourmet Factory's expert, Dr. Stanton:

> Q:     Did you ever go to the supermarket looking for pomace oil?
>
> A:     No.
>
> Q:     Can you tell me the name of anyone on earth that has ever
>        gone to the supermarket looking to buy pomace oil?
>
> A:     No.

Stanton Dep. at 73:8-20; Marchese Decl. Ex. I. This testimony is also consistent with Mr.

Weir's observation that olive oil outsells pomace oil by 50 to 1 in terms of volume, at a 50% to

100% price premium. Weir Dep. at 255:20-256:1, Marchese Decl. Ex. K.

Seventh, Gourmet Factory's former Director of Quality Assurance and Food Safety,

Maria Inetti, testified that she would not feed the Capatriti pomace oil to her own family because

"it's not a good quality." Inetti Dep. at 164:12-165:3, Marchese Decl. Ex. J. She also testified

that she would "feel cheated" if she had bought Capatriti:

> Q:     If you had bought the Capatriti 100% Pure Olive Oil in the
>        store, and took it home and fed it to your family and then
>        later found out that it was pomace oil, would you have been
>        upset?
>
> A:     Yes.
>
> Q:     Why?
>
> A:     Because I would feel cheated.

*Id.* at 144:23-145:7.

> Q:     You think it was not fair?
>
> A:     Yes.
>
> Q:     Not fair for who?
>
> A:     For the customers.
>
> Q:     Why?
>
> A:     Because it wasn't – it wasn't what they were paying for.

*Id.* at 144:13-20.  Plaintiff Jenkins echoed Ms. Inetti's statement:

> Q:     Do you – do you feel the same way Ms. Inetti does?
>
> A:     Yes.
>
> Q:     Why is that?
>
> A:     For reasons previously stated.  That I purchased the product
>        that in fact wasn't what it advertised.  But more importantly
>        hearing that an internal employee who was the head of
>        quality assurance feels so strongly on this matter, that, it's
>        very upsetting.
>
> Q:     Do you think other purchasers would feel cheated just the
>        same way that you and Ms. Inetti feel cheated?
>
> A:     Yes.
>
> Q:     Do you think every class member was cheated similarly?
>
> A:     Yes.
>
> Q:     Do you think there's any way someone could not feel
>        cheated in these circumstances?
>
> A:     No.

Jenkins Dep. at 209:21-210:21, Marchese Decl. Ex. A.

## III.  THE LEGAL STANDARD FOR CLASS CERTIFICATION

Class actions are an essential tool for adjudicating cases involving many small claims that are not economically feasible to prosecute individually.  In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  Class actions give voice to plaintiffs who "would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

To qualify for certification, Plaintiffs must demonstrate by a preponderance of the evidence that the putative class action meets each of the four requirements of Rule 23(a), and also satisfies at least one of the categories provided in Rule 23(b).  *See In re Visa Check / MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001).  The Court must conduct a "rigorous analysis," which may require it to "probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  However, "[t]he Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction.'" *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting *Mariso A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).  Indeed, "it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Id.* at 361-62 (quoting *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

## IV.  THE REQUIREMENTS OF RULE 23(a) ARE READILY MET

Rule 23(a) sets forth four prerequisites for certification:  numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).

### A.      The Class Satisfies The Numerosity Requirement

Generally, a presumption of numerosity attaches to classes of more than 40 in the Second Circuit.  *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  This case easily satisfies the numerosity requirement.  The Court has already found that the Class exceeds 100 members in its Memorandum Order on subject matter jurisdiction, noting that "defendant does not contest that this consumer class action involves more than 100 members."  5/26/13 Memorandum Order at 3 [Dkt. No. 34].  Retail sales of Capatriti during the class period were roughly $81.24 million.  Weir Decl. ¶ 16.

### B.      Commonality Is Satisfied

Commonality is met "if there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality does not mandate that all class members make identical claims and arguments."  *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996).  The commonality requirement may be met where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system."  *Marisol A.*, 126 F.3d at 377.  In fact, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement."  *Dukes*, 131 S. Ct. at 2562.

The common central issue in this case is quite simple:  whether the pomace oil packed into Capatriti tins was or was not "100% Pure Olive Oil."  Gourmet Factory contends the pomace oil was "olive oil" because it was, in some sense, derived from the fruit of the olive tree.  Plaintiffs contend the pomace oil was not olive oil because, unlike olive oil, pomace oil has no flavor, and because of the significant chemical and economic differences between pomace oil and olive oil.  Each of the seven categories of evidence detailed in Part II, above, confirming that pomace oil is not remotely what the ordinary consumer understands olive oil to be, is common to

all class members.  In addition, other common factual and legal questions include whether

Gourmet Factory negligently misrepresented that Capatriti was "100% Pure Olive Oil," and

whether Gourmet Factory defrauded purchasers by labeling Capatriti as "100% Pure Olive Oil."

With respect to the New York Subclass, another common legal and factual question is whether

Gourmet Factory's conduct violated New York's General Business Law § 349.  With respect to

the New Jersey Subclass, additional common legal and factual questions include whether

Gourmet Factory breached express warranties, breached the implied warranty of merchantability,

and violated the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

### C. Plaintiffs' Claims Are Typical

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class.  Fed. R. Civ. P.

23(a)(3).  "The typicality requirement is not demanding."  *Fogarazzao v. Lehman Bros., Inc.*,

232 F.R.D. 176, 180 (S.D.N.Y. 2005) (internal quotations omitted).  Typicality is satisfied "when

each class member's claim arises from the same course of events and each class member makes

similar legal arguments to prove the defendant's liability."  *Robidoux*, 987 F.2d at 936.  "When it

is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and

the class sought to be represented, the typicality requirement is usually met irrespective of minor

variations in the fact patterns underlying individual claims."  *Id.* at 936-37; *see also Green v.

Wolf Corp.*, 406 F.2d 291, 300 (2d Cir. 1968) (stating that denial of class certification "because

all of the allegations of the class do not fit together like pieces in a jigsaw puzzle … would

destroy much of the utility of Rule 23").

Here, Plaintiffs' and other Class members' claims arise out of the same course of conduct

by Defendant and are based on the same legal theories.  Every tin was labeled "100% Pure Olive

Oil" and every tin in fact contained pomace oil.  *See, e.g.*, Jenkins Dep. at 41:17-22, Marchese

Decl. Ex. A ("I purchased a tin of olive oil expecting what the label said, that it was a hundred percent olive oil, when it fact it turned out to not be 100 percent olive oil."); *id.* at 209:21-210:21 (stating that Jenkins feels that he was "cheated" by the sale, and that "every class member was cheated similarly"); Ebin Dep. at 47:25-48:10, Marchese Decl. Ex. B ("The olive oil that I purchased said all over it that it's a hundred percent pure olive oil.  And that was the primary reason I bought it, was because I wanted a hundred percent pure olive oil.  I was dissatisfied with the product and later learned unsurprisingly that it was not in fact a hundred percent pure olive oil, but rather olive pomace oil.  I'm here representing a class of people that also bought this product that were wronged because of false advertising and breach of warranty.").  Plaintiffs have been injured in the same manner as the putative class members and seek redress through common legal claims.  Plaintiffs' claims are therefore typical of the Class and Subclasses.

### D. Plaintiffs Will Adequately Represent The Class And Subclasses

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Generally, adequacy of representation entails inquiry as to whether:  (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both of these factors are met here.

### 1. Plaintiffs' Interests Do Not Conflict With The Class Or Subclasses

Neither Plaintiffs nor their counsel have any interest antagonistic to absent Class members.  Plaintiffs, like each absent Class member, have a strong interest in proving Defendant's common course of conduct, establishing its unlawfulness, demonstrating the impact of the unlawful conduct, and obtaining redress.

Both Jenkins and Ebin have also demonstrated their commitment to pursue these claims on behalf of absent class members. Both have responded to extensive written discovery requests and have sat for lengthy depositions. During his 6-hour deposition, Jenkins stated that he had reviewed and commented on the complaint before it was filed, Jenkins Dep. at 51:9-14, Marchese Decl. Ex. A, that he reviewed and verified detailed responses to interrogatories and requests for admission, *id.* at 214:7-9, 218:22-219:1, 221:19-21, that he is willing to testify at the trial of this action, *id.* at 233:4-7, and that he feels "very strongly" about the merits of his claims, *id.* at 233:13-17. During his 7-hour deposition, Ebin similarly testified that he provided verified responses to Defendant's interrogatories and requests for admission, provided his lawyers with guidance to prosecute the case, maintains constant contact with legal counsel, and remains aware of the status of the case. Ebin Dep. at 66:12-21, 67:17-22, 68:1-14, 88:21-90:4, 98:21-99:15, Marchese Decl. Ex. B. Mr. Ebin also testified that he is "committed to" the case and understands that he is responsible to the class going forward to continue to oversee the case, to continue to provide guidance to his lawyers, and to be available as necessary to see this action through to its end. *Id.* at 70:13-24. Moreover, Mr. Ebin testified that he expects to spend "as much [time] as it takes" on this matter as a class representative going forward. *Id.* at 77:10-15.

### 2. Plaintiffs' Counsel Are Qualified

Plaintiffs' counsel, Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims, including claims against food manufacturers. *See* Bursor & Fisher, P.A. Firm Resume, Marchese Decl. Ex. M. The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million verdicts or recoveries in 5 of 5 class action jury trials since 2008. *Id.* The Court has already stated that it is "self-evident" that

Plaintiffs' counsel "is more than capable of handling this case." Transcript of Oral Argument, August 15, 2013 at 22:9-10 [Dkt. No. 39].

## V. THE PROPOSED CLASS SATISFIES RULE 23(b)(3)

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both are met here.

### A. Common Questions Of Law Or Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Notably, Rule 23(b)(3) calls only for "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

In this action, the legal and factual issues do not require individualized determinations, but can be resolved through generalized proof applicable to each of the Plaintiffs' five claims.

### 1. The Elements Of The New York And New Jersey Consumer Protection Claims Can Be Established Through Common Proofs

Plaintiff Ebin alleges violations of New York General Business Law ("GBL") § 349 on behalf of a Subclass of all Class members who purchased Capatriti in New York. Compl. ¶ 54. Plaintiff Jenkins alleges violations of New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.* (the "NJCFA") on behalf of a Subclass of all Class members who purchased Capatriti

"100% Pure Olive Oil" in New Jersey. *Id.* ¶ 55. These claims involve common questions that predominate over any individual issues that may arise.

Under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.* (the "NJCFA"), plaintiffs must establish "1) unlawful conduct by defendant[s]; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). Importantly, "causation under the [NJ]CFA is not the equivalent of reliance." *Lee v. Carter-Reed Co., L.L.C.*, 203 N.J. 496, 577 (2010). The NJCFA "does not require proof of reliance." *Gennari v. Weichert Cop. Realtors*, 148 N.J. 582, 590 (1997). This claim is subject to common proof. *See Carter-Reed Co.,* 203 N.J. at 527-28 ("When all the representations about the product are baseless, a trier of fact may infer the causal relationship …. [T]he [NJ]CFA does not require proof of reliance, but only a causal connection between the unlawful practice and ascertainable loss." (internal quotations omitted)); *Elias v. Unger Food Products, Inc.*, 252 F.R.D. 233, 249 (D.N.J. 2008) ("Where representations are in written and uniform materials presented to each prospective plaintiff, there is a presumption of causation in NJCFA cases.").

Elements of NY GBL § 349 are very similar to the NJCFA. GBL § 349 defines a deceptive act or practice using an "objective definition," whereby deceptive acts or practices, including omissions are "limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005). "[R]eliance is not an element of a section 349 claim." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). This claim is also subject to common proof. *See Super Glue Corp. v. Avis Rent A Car Sys.*, 132 A.D.2d 604 (1987) (reversing denial of class certification of unfair trade practices claim where claims were based on defendant's "standardized rental agreements");

*Taylor v. American Bankers Ins. Group.*, 267 A.D.2d 178 (1999) (affirming certification of claim for violation of GBL § 349 based on defendants' uniform offers of insurance coverage); *Morrissey v. Nextel Partners, Inc.* 72 A.D.3d 209, 895 N.Y.S.2d 580 (2010) (certifying class under GBL § 349 given the uniformity of a cellular telephone company's spending limit fee increase disclosure); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 480-83 (C.D. Cal. 2012) (certifying class under GBL § 349 where all purchasers of hair product were subject "to the same deceptive marketing and advertising").

Here, every class member saw the same material representation that Capatriti was "100% Pure Olive Oil" because that statement appeared in large letters the front, back, left, right, and top of the tin. *See* Marchese Decl. Ex. N (photos of these five surfaces of the Capatriti tin); *see also* Ebin Dep. at 48:1-5, Marchese Decl. Ex. B ("The olive oil that I purchased said all over it that it's a hundred percent pure olive oil. And that was the primary reason I bought it, was because I wanted a hundred percent pure olive oil."). There can be no doubt that every purchaser saw that material statement and expected there was "100% Pure Olive Oil" in the tin. *See, e.g.*, *id.* at 179:11-15 ("I would say that I know that when people buy a product that says a hundred percent pure olive oil, it's almost certainly because they're looking to buy a hundred percent pure olive oil."). Whether that representation was true or false turns entirely on generalized evidence concerning whether pomace oil is in fact "100% pure olive oil," including the seven categories of evidence detailed in Part II, above. If, as Plaintiffs contend, pomace oil is not olive oil, then the label was literally false. The same generalized evidence will establish that Capatriti's false label was likely to mislead a reasonable consumer acting reasonably under the circumstances. *See, e.g.*, Themis Kangadis Dep. at 223:16-224:11, Marchese Decl. Ex. G ("It's called marketing. … [C]onsumers, you know, from what we know being in the industry, they like to see the word

'Pure.' As a matter of fact, consumers think that pure is better than extra virgin."). And the same generalized evidence will establish that all purchasers were cheated by the substitution of an economically inferior product that did not meet their expectations. *See, e.g.*, Inetti Dep. at 144:13-145:7, Marchese Decl. Ex. J (admitting customers were "cheated" because the pomace oil "wasn't what they were paying for"); Weir Dep. at 255:20-256:1, Marchese Decl. Ex. K (observing that olive oil outsells pomace by 50 to 1 in terms of volume, at a 50% to 100% price premium).

### 2. The Elements Of The Warranty Claims Can Be Established Through Common Proofs

Plaintiff Jenkins alleges breach of express and implied warranties on behalf of a Subclass of all Class members who purchased Capatriti "100% Pure Olive Oil" in New Jersey. Compl. ¶ 55. These allegations also involve common questions that predominate over any individual issues that may arise. "An express warranty is created when a seller makes a promise to a buyer related to a good or promises that a good will conform to a specific description." *Elias*, 252 F.R.D. at 250 (D.N.J. 2008) (finding that predominance exists over claim for breach of express warranty because an "expressed promise" on the packaging "had been breached" and therefore "no individual inquiry [wa]s needed to resolve plaintiffs' claim"). "To establish a breach of an express warranty … the plaintiff need not prove privity or traditional reliance." *Id.*; *see also Bregman Screen & Lumbar Co. v. Bechefsky*, 16 N.J. Super. 35, 41 (App. Div. 1951) (stating that "as a rule, no proof of the buyer's reliance on the warranty is necessary other than that the seller's statements were of a kind which naturally would induce the purchase"). Every tin sold to class members had a material, express promise in large letters on the front, back, left, right, and top of the tin that the contents inside were "100% Pure Olive Oil." Marchese Decl. Ex. N (photographs of five surfaces of the tin). The central question, again, is whether the

substance inside, pomace oil, conforms to that specific description. Again the same seven categories of evidence detailed in Part II, above, will determine that question with respect to all class members.

Common issues also predominate over the claim for breach of the implied warranty of merchantability. "New Jersey implies a warranty of merchantability in every contract for the sale of goods." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 454 (D.N.J. 2012). "[F]or goods to be merchantable they must at least:" "pass without objection in the trade under the contract description; ... [be] fit for the ordinary purposes for which such goods are used; and ... conform to the promises or affirmations of fact made on the container or label if any." N.J. Stat. Ann. § 12A:2-314. "In order for the implied warranty of merchantability to be breached, the product at issue must have been defective or not fit for the ordinary purpose for which it was intended." *Montich*, 849 F. Supp. 2d at 454. Again, the same seven categories of evidence detailed in Part II, above, will determine that question with respect to all class members. *See also* Mailer Decl. ¶ 54 ("Under any standard, pomace oil is not olive oil, and in no case could it be called or understood to be olive oil."); Mailer Dep. at 329:14-20, Marchese Decl. Ex. O ("[S]tandards being adopted by countries all over the world make quite clear that there's a difference between pomace oil and olive oil. So there's nothing that would support pomace oil being labeled as 100% olive oil.").

### 3. The Elements Of Fraud And Negligent Misrepresentation Can Be Established Through Common Proofs

Finally, predominance is also met for the nationwide Class for Plaintiffs' claims for fraud and negligent misrepresentation. The Second Circuit made clear that the predominance requirement is met for claims sounding in fraud where they are based on uniform representations made to all members of the Class:

> Fraud actions must … be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). *See also Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977) ("[T]he key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations."). Here, because Defendant uniformly misrepresented its pomace oil product to be "100% Pure Olive Oil" to all Class members on every side of every tin, *see* Marchese Decl. Ex. N (pictures of tin), this action is an "appropriate subject[] for class certification because the standardized misrepresentations may be established by generalized proof." *Moore*, 306 F.3d at 1253. Indeed, it is impossible that Class members did not rely on Defendant's misrepresentation as it concerned the name of, and nature of the very product which they purchased. *See, e.g.*, Ebin Dep. at 179:11-15, Marchese Decl. Ex. B ("I would say that I know that when people buy a product that says a hundred percent pure olive oil, it's almost certainly because they're looking to buy a hundred percent pure olive oil."). Again with respect to the claims for fraud and negligent misrepresentation, the same seven categories of evidence detailed in Part II, above, will determine Defendant's liability with respect to all class members.

**B. Class Litigation Is Superior To Other Methods Of Adjudication**

Finally, a class action is the superior method of adjudication. Rule 23(b)(3) provides four factors for the Court's consideration:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).  All of these factors favor class treatment here.

First, Rule 23(b)(3)(A) weighs in favor of certifying a class because it would cost Class members much more to litigate an individual case than they could recover in damages.  Where proceeding individually would be prohibitive due to the minimal recovery, "the class action device is frequently superior to individual actions."  *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  Prices for a 101 fluid ounce tin of Capatriti "100% Pure Olive Oil" were between $10 and $20.  *See, e.g.*, Jenkins Dep. at 83:12, Marchese Decl. Ex. A ("$10.88, before tax"); Ebin Dep. at 36:6-7, Marchese Decl. Ex. B ("Q: Do you know how much you paid?  A: Yes.  $16.49.").  The small amount at issue for each Class member renders individual litigation infeasible, but a class action offers the potential for meaningful redress to the Class.

Defendant has suggested that it will raise questions concerning the manageability of the litigation and the potential difficulty of identifying class members.  For example, Defendant's counsel vigorously examined both class representatives for failing to preserve their tins of Capatriti oil for testing.  But those criticisms are misplaced, since the Defendant has admitted, repeatedly, that "Capatriti was never an 'olive oil mixture,' … as at all relevant times prior to this action, it contained only Olive-Pomace Oil."  5/3/13 Def.'s Mem. Of Law In Supp. Of Mot. To Dismiss at 8, [Dkt. No. 11]; *see also* Dennis Kangadis Dep. at 117:23-25, Marchese Decl. Ex. C ("The Capatriti one hundred percent pure olive oil was olive pomace oil.").  There is thus no need for any testing of the Plaintiffs', or class members', individual tins.  Defendant's counsel also vigorously criticized the class representatives for failing to retain receipts for their purchases, and has suggested that the possibility that other class members have similarly failed to retain receipts creates manageability problems.  Retention of receipts, however, is not an

essential element for the management of a class action, or for establishing proof of injury and damages. In any event, the possible need for individualized damage calculations will not automatically defeat class certification. *See Blessing v. Sirius XM Radio Inc.*, 2011 WL 1194707, at *8 (S.D.N.Y. Mar. 29, 2011) ("[T]hat damages have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification.") (internal quotations omitted); *see also Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009) ("The fact that the mechanical calculation of each member's damages will have individualized aspects does not preclude class certification.").

Nor does the possibility that class members will have discarded the product or their receipts render the class unascertainable. The implied requirement of ascertainability turns on the definition of the proposed class. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006). The class must be "identifiable" such that "its members can be ascertained by reference to objective criteria." *In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). The standard for ascertainability "is not demanding." *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010). "It is designed only to prevent the certification of a class whose membership is truly indeterminable." *Id.* Moreover, although the membership of the class must be ascertainable "at some point in the case," it need not be determined prior to class certification. *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 341-42 (S.D.N.Y. 2004) (internal quotations and citations omitted). Here, class members can be identified by reference to "objective criteria." As Judge Marilyn Huff explained in *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013):

> Defendant's concern that the Court will have difficulty identifying members of the class is unavailing. Because Defendant does not have records of consumer purchases, and potential class members will likely lack proof of their purchases, Defendant argues that the

Court will have no feasible mechanism for identifying class members and will have to pursue proof individual to each class member. However, "[t]here is no requirement that 'the identity of the class members ... be known at the time of certification.' " *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 536 (N.D.Cal. 2012); *Wolph,* 272 F.R.D. at 482. If class actions could be defeated because membership was difficult to ascertain at the class certification stage, "there would be no such thing as a consumer class action." *Ries,* 287 F.R.D. at 536. As long as the class definition is sufficiently definite to identify putative class members, "[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification." *Id.*

*Id.* at 500.

The Class and Subclasses consist of "persons in the United States who purchased Capatriti 100% Pure Olive Oil packed before March 1, 2013." There is nothing subjective about the Class definition: simply put, either individuals purchased the product, or they did not. It is administratively feasible to identify class members by reference to these criteria. Indeed, class certification is routinely granted in consumer cases even where class members are unlikely to have receipts. *See* Marchese Decl. Ex. P (listing 34 cases in which classes were certified on consumer claims where purchasers were unlikely to have retained receipts). Class action administrators have developed many reliable techniques for providing notice and distributing class recoveries without the need for receipts. *See* Declaration Of Steven Weisbrot ¶¶ 10-17 (describing a variety of administratively feasible methods for identifying class members).

With respect to the manageability prong of Rule 23(b)(3), the Second Circuit has noted that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Visa Check/Mastermoney Antitrust Litig.*, 208 F.3d 124, 140 (2d Cir. 2001) (citations and internal quotations omitted). Instead, the Second Circuit recommended that district courts make use of a variety of management tools to temper potential problems caused by potential manageability

issues.  *See id.* at 141.

It would be particularly unjust for theoretical manageability concerns to pose an obstacle to class certification here.  The evidence in this case leaves little doubt that Gourmet Factory, as well as several members of the Kangadis family, committed a massive fraud on millions of purchasers of Capatriti "100% Pure Olive Oil."  Without class certification, they will retain the profits of that fraud and be incentivized to repeat their illegal conduct.  This is precisely the type of case that requires class treatment if there is to be any possibility of redress.  As Judge Posner put it:

> "The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.  But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative – no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied – to no litigation at all."

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Concerns over the potential for fraudulent claims in the postjudgment distribution process pale by comparison to concerns about the actual fraud that has already been committed, on a massive scale, by Gourmet Factory and the Kangadis family.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion to certify the Class and the New York and New Jersey Subclasses.

Dated:  November 1, 2013

Respectfully submitted,


By:    */s/ Joseph I. Marchese*
        Joseph I. Marchese

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Neal J. Deckant (ND1984)
Yitzchak Kopel (YK5522)
888 Seventh Ave
New York, NY 10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       ndeckant@bursor.com
       ykopel@bursor.com

*Attorneys for Plaintiffs*